1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOORE CONSTRUCTION CO., | ) 1:08-cv-00020-SMS |
| Plaintiff, | ) ORDER GRANTING DEFENDANT'S MOTION<br>) FOR SUMMARY JUDGMENT (Doc. 19) |
| v. | ) |
| QUANTA SPECIALTY LINES<br>INSURANCE COMPANY, et al., | ) ORDER DIRECTING THE CLERK TO<br>) ENTER JUDGMENT FOR DEFENDANT |
| Defendant. | ) QUANTA SPECIALTY LINES INSURANCE<br>) COMPANY AND AGAINST PLAINTIFF<br>) MOORE CONSTRUCTION CO. |

Plaintiff is proceeding with counsel with a civil action in this Court. The matter has been referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Local Rules 72-302 and 72-303.

Pending before the Court is the motion of Defendant Quanta Specialty Lines Insurance Company (Quanta or Defendant) for summary judgment on various claims stated in the complaint that was originally filed in the Tuolumne County Superior Court on November 8, 2007, and was removed to this Court on or about January 4, 2008. (Notice of Removal, Doc. 4, p. 10.) Defendant filed its motion on February 9, 2009, including a memorandum of law, statement of undisputed facts, and declarations of John Manzi, Andrew R. Neilson, and Frank Schulze. Plaintiff filed

1  opposition on April 15, 2009, including a memorandum of law,

2  statement of disputed facts, and declaration of Walter Moore.

3  Defendant filed a reply on April 24, 2009, including a memorandum

4  of law and objections to evidence, as well as a proposed order.

5  Defendant's motion came on regularly for hearing on May 1, 2009,

6  at 9:30 a.m. in Courtroom 7 before the Honorable Sandra M.

7  Snyder, United States Magistrate Judge. Andrew Ryan Neilson

8  appeared on behalf of Defendant, and Herman A.D. Franck, V

9  appeared on behalf of Plaintiff. After argument the matter was

10  submitted to the Court.

11      Defendant moves for judgment with respect to two different

12  contracts, which the Court will analyze separately.

13      I. <u>Summary Judgment</u>

14      Summary judgment is appropriate when it is demonstrated that

15  there exists no genuine issue as to any material fact, and that

16  the moving party is entitled to judgment as a matter of law.

17  Fed. R. Civ. P. 56(c). Under summary judgment practice, the

18  moving party

19              [A]lways bears the initial responsibility of
                informing the district court of the basis for

20              its motion, and identifying those portions of
                "the pleadings, depositions, answers to

21              interrogatories, and admissions on file,
                together with the affidavits, if any," which

22              it believes demonstrate the absence of a
                genuine issue of material fact.

23
<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). It is the

24
moving party's burden to establish that there exists no genuine

25
issue of material fact and that the moving party is entitled to

26
judgment as a matter of law. <u>British Airways Board v. Boeing Co.</u>,

27
585 F.2d 946, 951 (9th Cir. 1978).

28

Where a party with the ultimate burden of persuasion at trial as to a matter moves for summary judgment, it must demonstrate affirmatively by evidence each essential element of its claim or affirmative defense and must establish that there is no triable issue of fact as to each essential element such that a rational trier of fact could render a judgment in its favor. Southern California Gas Co. v. City of Santa Ana, 336 F.3d 885, 888 (9th Cir. 2003). If a party moves for summary judgment with respect to a matter as to which the opposing party has the ultimate burden of persuasion at trial, then the moving party must show that the opposing party cannot meet its burden of proof at trial by establishing that there is no genuine issue of material fact as to an essential element of the opposing party's claim or defense; the moving party must meet the initial burden of producing evidence or showing an absence of evidence as well as the ultimate burden of persuasion. Nissan Fire Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102 (9th Cir. 2000). In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the opposing party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. Id. (citing High Tech Gays v. Defense Indus. Sec. Clearance Office, 895 F.2d 563, 574 (9th Cir. 1990)). In order to carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact. Id.

However, "where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion

3

may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." Celotex Corp. v. Catrett, 477 U.S. 317, 323. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits or admissible discovery material in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809

4

1 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine,
2 i.e., the evidence is such that a reasonable jury could return a
3 verdict for the nonmoving party, Wool v. Tandem Computers, Inc.,
4 818 F.2d 1433, 1436 (9th Cir. 1987).

5     In the endeavor to establish the existence of a factual
6 dispute, the opposing party need not establish a material issue
7 of fact conclusively in its favor. It is sufficient that "the
8 claimed factual dispute be shown to require a jury or judge to
9 resolve the parties' differing versions of the truth at trial."
10 T.W. Elec. Serv., 809 F.2d at 630. Thus, the "purpose of summary
11 judgment is to 'pierce the pleadings and to assess the proof in
12 order to see whether there is a genuine need for trial.'"
13 Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)
14 advisory committee's note on 1963 amendments). The evidence of
15 the opposing party is to be believed, Anderson, 477 U.S. at 255,
16 and all reasonable inferences that may be drawn from the facts
17 placed before the court must be drawn in favor of the opposing
18 party, Matsushita, 475 U.S. at 587 (citing United States v.
19 Diebold, Inc., 369 U.S. 654, 655 (1962)(per curiam)).
20 Nevertheless, it is the opposing party's obligation to produce a
21 factual predicate from which an inference may be drawn. Richards
22 v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal.
23 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987). Although the
24 Court must not weigh the evidence, the Court must draw reasonable
25 inferences; evidence that is too insubstantial or speculative may
26 be insufficient to establish the existence of a genuine issue of
27 material fact. Coca-Cola Co. v. Overland, Inc., 692 F.2d 1250,
28 1255 (9th Cir. 1982); Dept. of Commerce v. U.S. House of Rep., 525

U.S. 316, 334 (1999). A mere scintilla of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party. Anderson, 477 U.S. at 251-52. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Id. at 587.

The showings must consist of admissible evidence, Hollingsworth Solderless Terminal Co. v. Turley, 622 F.2d 1324, 1335 n.9 (9th Cir. 1980), or pleadings, depositions, answers to interrogatories, admissions, and affidavits or declarations, Fed. R. Civ. P. 56(c). Affidavits shall be based on personal knowledge, set forth such facts as would be admissible in evidence, and show affirmatively that the affiant is competent to testify to the matters stated therein. Fed. R. Civ. P. 56(e). Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. Id. Declarations pursuant to 28 U.S.C. § 1746 may be used with the same force and effect as affidavits. Pollock v. Pollock, 154 F.3d 601, 611, n.20 (6th Cir. 1998). A plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence. Lopez v. Smith, 203 F.3d 1122, 1132 (9th Cir. 2000). Personal knowledge may be inferred from declarations themselves, such as from facts concerning a declarant's position and participation, Barthelemy v. Air Line Pilots Ass'n, 897 F.2d 999, 1018 (9th Cir. 1990); however, a court cannot draw an inference about facts not specifically put in the record by a party, and a court will not

assume that general averments embrace specific facts needed to sustain a complaint, Lujan v. National Wildlife Federation, 497 U.S. 871, 887 (1990). An admission in a pleading, including a defendant's failure to deny an allegation in a complaint, constitutes an admission. Fed. R. Civ. P. 8(d); Lockwood v Wolf. Corp., 629 F.2d 603, 611 (9th Cir. 1980). Unauthenticated documents cannot be considered on a motion for summary judgment. Hal Roach Studios, Inc. v. Richard Feiner and Co., 896 F.2d 1542, 1550 (9th Cir. 1990). Legal memoranda and oral argument are not evidence and do not create issues of fact capable of defeating an otherwise valid motion for summary judgment. British Airways Bd. v. Boeing Co., 585 F.2d 946, 952 (9th Cir. 1978).

The Court is not obligated to consider matters that are in the record but are not specifically brought to its attention; the parties must designate and refer to specific triable facts. Even in the absence of a local rule, for evidence to be considered, the party seeking to rely on it must specify the fact by indicating what the evidence is or says and must indicate where it is located in the file. Although the Court has discretion in appropriate circumstances to consider other material, it has no duty to search the record for evidence establishing a material fact. Carmen v. San Francisco United School Dist., 237 F.3d 1026, 1029 (9th Cir. 2001).

A party moving for summary judgment is entitled to the benefit of any relevant presumptions that support the motion provided that the facts giving rise to the presumption are undisputed. Coca-Cola Co. v. Overland, Inc., 692 F.2d 1250, 1254 (9th Cir. 1982).

/////

II. <u>General Commercial Liability Policy for Construction
    Business (Contract QNG0005381-00)</u>

   A. Allegations of the Complaint

   The third claim in Plaintiff's complaint is for breach of a
written contract entered into on or about July 31, 2005, policy
number QNG0005381-00, between Plaintiff and Defendant, consisting
of a general commercial liability policy to cover Plaintiff's
operations as a general contractor.

   The policy contained provisions concerning adjustment of
premiums after an audit. Plaintiff alleged that the premium rates
were prepared when future revenues were estimated to be
$3,600,000, amounting to an actually "paid/owing" premium amount
of $169,344; however, the actual levels of sales were $766,939,
which generated revised premium amounts of $9,019 and $27,057,
yielding a difference in premiums of $133,267 if the premiums
were adjusted under paragraph 2 of the "Minimum Premium
Endorsement" part of the insurance contract, "[See Exhibit A,
page 3]." (Doc. 4, pp. 18-19, attachments BC-1, BC-2, D to third
claim; Doc. 4 p. 19.) Despite Plaintiff's request for a return of
the sum, Defendant refused and failed to return the funds. (<u>Id.</u>
p. 19.)

   The fourth claim is a common count for money had and
received by defendant for the use and benefit of Plaintiff in the
sum of $133,261.00 in the form of an insurance premium
overpayment. (Doc. 4, p. 20.) Plaintiff alleged that the
insurance policy provided for an adjustment; to the extent that
the policy is to be read differently, it is ambiguous, and any

8

1  ambiguity should be read in favor of Plaintiff; to allow
2  Defendant to keep the higher premiums paid would constitute
3  unjust enrichment. Id. p. 20.

4          B. The Parties' Contentions

5          With respect to the general commercial liability
6  policy, Defendant argues that after the end of the contract's
7  term, Defendant audited the basis for the premium and refunded
8  what was due under the contract; therefore, Plaintiff cannot
9  establish a breach of contract, an essential element of
10 Plaintiff's case. Plaintiff, however, argues that the terms of
11 the contract with respect to audits and/or return of excess
12 premiums after an audit are ambiguous, and thus there is an issue
13 of material fact as to whether or not Defendant breached the
14 contract.

15          C. Facts Concerning the General Commercial Liability
                Policy and Audit
16
17      Frank Schulze, a broker at Rogers & Young Insurance
   Services, was Plaintiff's insurance broker in July 2005, and
18
   Schulze faxed to Moore Construction (Moore) a general liability
19
   insurance proposal dated July 27, 2005, after which the proposal
20
   was accepted, and coverage was bound. (Schulze Decl. ¶ 1, Ex. A
21
   p. 4.)
22
       Plaintiff does not deny that he received the proposal (as
23
   distinct from denying that he was provided with "minimum premium
24
   provisions") in July 2005, but he points to an insurance summary
25
   prepared by Rogers and Young that was dated January 11, 2006, a
26
   date about six months after the inception date of the policy.
27
28                              9

1   (Moore Decl., ¶ 16, Ex. N, response to interrogatory no. 8 re:
2   RFA (requests for admissions) 35.) The existence of a later
3   summary does not contradict the assertion of sending the proposal
4   to Plaintiff. Further, in his response to interrogatory no. 8,
5   Plaintiff cites to a list of witnesses and documents, but neither
6   the identity nor the substance of the evidence known by such
7   witnesses or reflected by such documents is set forth or
8   appropriately brought to the Court's attention. The Court
9   concludes that there is no real dispute as to the sending of the
10  proposal.

11      Further, the undisputed evidence shows that the policy was
12  thereafter issued, had a term that began on July 31, 2005 and
13  ended on July 31, 2006, and was subject to a later audit
14  conducted on September 28, 2006. (Undisp. Facts nos. 16, 23-24.)

15      The proposal stated that the commercial general liability
16  policy included the following "conditions": 25% minimum earned
17  premium; 80% minimum & deposit premium. (Schulze Decl., Ex. A,
18  fourth page (unpaginated).)

19      The proposal faxed to Moore from Rogers and Young included
20  insurance premium audit information. It was stated that if the
21  proposed premium was based on estimates of annual exposures, they
22  might be subject to audit at the expiration of the policy for the
23  actual exposures. (Id. at eighth page, last paragraph.) It
24  explained that an audit was a report of the findings from an
25  examination of the insured's operation, records, and books of
26  account to determine the actual insurance exposures for the

27
28                              10

coverage provided. (Id. at tenth page.) With respect to when an audit was necessary, the information indicated that an audit should be performed annually, or after the expiration of a policy which had a variable premium base. Examples of coverage subject to an audit included general liability and premises operations liability. (Id.) It was stated that an audit was necessary to determine the correct exposure or premium base for the insurance coverage afforded; if necessary, an adjustment would be made to the premium that was estimated when the policy was issued. (Id.)

Reference to the policy reflects that the Common Policy Declarations included a statement that the policy consisted of various coverage parts for which a premium was indicated. It is stated:

> This premium may be subject to adjustment. The policy writing minimum premium for this policy is $5,000.

(Manzi Decl., Ex. B, p. QUANTA 000009.)

The "TOTAL POLICY PREMIUM" is listed as $169,344. (Id.) Although Plaintiff purports to dispute this fact, there is no evidence warranting a reasonable inference that this was not the amount of the total policy premium stated on the declarations.[1]

---

[1] Reference to Plaintiff's responsive statement of disputed facts in support of the opposition to the motion shows that Plaintiff stated on page 3, item 17 that Plaintiff disputed the initial total policy premium as stated in the declarations in the amount of $169,344, an objective fact easily established; then on page 13, item 5, Plaintiff asserts as a fact that Plaintiff agreed to pay a total of $169,344 in premiums on the policy. Because of Plaintiff's admission, the Court concludes that the initial total policy premium as stated in the declarations was indisputably $169,344.

The Court further notes that as noted in Defendant's objections to evidence, some of the materials in the responsive statement, such as Plaintiff's calculations of return premiums or ratios, Moore's opinion as to Quanta's having breached the contract, and his present construction of the terms of the contract constitute impermissible, inadmissible lay opinion or inadmissible expert opinion, legal conclusions, theory, or argument concerning how the document should be understood. The inclusion of such matter in the responsive statement has resulted in unnecessary consumption of the Court's resources and delay in the ultimate resolution of this motion.

The premium was based on an estimated exposure of $3,600,000 with stated rates. (Id. at p. QUANTA 000012.) A composite rate endorsement to the policy stated that the composite rated premium for the policy should be based on exposure consisting of $3,600,000 in sales/receipts, with a composite rate of $47.04/$1000. (Id. at QUANTA000055.) The contract states that the insurer may examine and audit the insured's books and records relating to the policy during the term of the policy and for three years afterwards, and that the first named insured shown in the declarations is the payee for any return premiums that would be paid. (Id. p. QUANTA000015.) It contains provisions concerning premium auditing:

**5. Premium Audit**

a. We will compute all premiums for this Coverage Part in accordance with our rules and rates.

b. Premium shown in this Coverage Part as advance premium is a deposit premium only. At the close of each audit period we will compute the earned premium for that period and send notice to the first Named Insured. The due date for audit and retrospective premiums is the date shown as the due date on the bill. If the sum of the advance and audit premiums paid for the policy period is greater than the earned premium, we will return the excess to the first Named Insured.

c. The first Named Insured must keep records of the information we need for premium computation, and send us copies at such times as we may request.

(Id., Ex. B, p. QUANTA000032.)

Although Plaintiff sets forth the terms of the minimum premium endorsement in his declaration (Decl. ¶ 7), Plaintiff

also purports to dispute the assertion that the policy contained

a minimum premium endorsement by stating that the issue is

whether Moore Construction was entitled to an audit and refund

based on actual project revenues. (Pltff.'s Responsive Stmt., no.

18.) Again, the Court looks only to the face of the documents at

this point, and thus considers Plaintiff's setting forth of the

language of the provision to indicate the lack of any dispute as

to the presence of the endorsement language in the contract. The

policy stated:

**MINIMUM PREMIUM ENDORSEMENT**

The premium(s) due for this policy shall be calculated
in accordance with the following:

1. The minimum earned premium shall be fully earned
at the inception of the policy and is twenty-five percent
(25%) of the amount entered as the total policy
premium in the Declarations.

2. The premium entered on the Declarations is
a provisional premium only and is subject to
adjustment in accordance with the audit provisions
of this policy.

3. The minimum policy term premium for this policy
is eighty percent (80%) of the premium shown as the
total policy premium in the Declarations. In the event
of a return premium we will return the lesser of:

a. The return premium calculated in
accordance with the audit rules on this policy; or

b. Twenty percent (20%) of the premium shown as
the total policy premium in the Declarations.

(Manzi Decl., Ex. C.)

With respect to the policy, there are several pages relating

to audit adjustments in the policy resulting in premium changes.

(Manzi Decl., Ex. B, pp. QUANTA000001-000003.) John Manzi,

Quanta's Policy Services Manager, explains that an audit yielded the return premium calculation of -$119,219. (Manzi Decl. at ¶ 6, Ex. B, at QUANTA000003.) Other pages indicate other calculations with other categories but are not explained. (Id. at QUANTA000001-02.)

Plaintiff declares that Defendant Quanta conducted an audit of premiums due by Stan Caplan and a company called Overland Solutions, Inc., which confirmed an amount of an adjustment owing in the amount of $133,267. (Decl. of Moore, ¶ 13, Ex. D.) This assertion appears to involve a statement of a third party offered for the truth of the matter asserted, and thus appears to be inadmissible hearsay. Plaintiff has not established that Caplan was acting on behalf of Quanta, and thus it is not determined whether an exception to the hearsay rule, such as an admission by a party, would apply.

Plaintiff states that an accounting that he prepared, Exhibit D, reflects the same adjustment. Defendant objects to Plaintiff's figures and accounting for lack of foundation; however, it is clear from the labels on the figures that Plaintiff used the premium rates used by the insurer in reaching the initial premium stated in the declarations, and Plaintiff applied them to different exposures, explained in paragraph 8 of his declaration, which he stated were the actual, lower levels of sales. Plaintiff stated that as a partner of Moore, he had personal knowledge of the matters set forth in the declaration based on his personal involvement; thus, Plaintiff is competent

14

to testify to the actual sales of the project he operated. To the extent that Plaintiff offers this evidence as opinion evidence of the correct adjusted premium, the Court sustains Defendant's objection to the lack of establishment of expertise to compute such a premium. It also appears to involve Plaintiff's opinion of the pertinent construction of the premium adjustment provisions of the policy, and as such it includes inadmissible opinion concerning legal, as distinct from factual, matters, such as the meaning of contract provisions.[2] Further, the audit rules for the contract are not specifically set forth, and there is no documentation establishing any method for computation of premium adjustment, so in any event, it cannot be determined whether or not Moore used correct data in his calculations. The Court understands this evidence as a computation that reflects Plaintiff's theory of the case. The Court further sustains Defendant's objections to Plaintiff's opinions that Defendant breached this contract and the other contract by what it remitted, or did not remit, as premium adjustments.[3]

Plaintiff adverts to numerous documents consisting of correspondence that he describes as "audit documents" obtained by Moore Construction from Quanta and designated auditors. (Decl.

---

[2] The Court notes that neither party offers extra-contract evidence of the parties' intentions during negotiations.

[3] Similarly, for the purposes of analysis of both contracts, the Court sustains Defendant's objections to Plaintiff's conjecture regarding the meaning of "pro rata" as improper opinion. Likewise, Plaintiff's assertions concerning ambiguity and the meaning of the policies, as distinct from any evidence of intention of the parties at the time of formation, are inadmissible opinion.

15

Moore, ¶ 21, Ex. E.) He does not present them in chronological order, summarize these documents, indicate the relevant circumstances or identity of the parties to the communications, explain their context, provide a clear foundation for them, or otherwise explain their import, except to assert that there was a refund of $133,267 owing. The Court sustains Defendant's objection to the evidence as lacking authentication and foundation.

Plaintiff also attaches documents he received from Rogers and Young, his insurance broker, including copies of what was described in correspondence to Moore from Cyndi J. Deveau of Rogers and Young, as the "final audit" of the general liability policy, which indicated a total return premium of -$119,219.00, along with an additional return of a state tax and stamping fee totaling $3,844.81. (Decl., ¶ 34, Ex. G.) Thereafter, HBWIS on behalf of Quanta remitted the lesser amount of $33,896 in accordance with the minimum premium endorsement. (Manzi Decl., Ex. B p. QUANTA000003.)

In any event, the Court does not find this particular level of factual dispute to be material. It is undisputed that there was an audit. There is no evidence concerning the precise data used in connection with this particular type of policy to determine a return premium, and the resulting return premium calculated from either party's point of view is an amount greater than twenty per cent of the premium shown as the total policy premium in the declarations.

16

1      D. <u>Legal Standards</u>

2          1. <u>Governing Law</u>

3      A federal court exercising diversity jurisdiction must apply

4   the substantive law of the state in which it sits except on

5   procedural issues and on matters governed by the United States

6   Constitution or federal statutes. <u>Erie Railroad Co. v.Tompkins</u>,

7   304 U.S. 64, 78 (1938). Federal courts sitting in diversity must

8   enforce state rules that are clearly substantive, "intended to be

9   bound up with the definition of the rights and obligations of the

10  parties." <u>Byrd v. Blue Ridge Rural Electrical Co-op, Inc.</u>, 356

11  U.S. 525, 536 (1958). State rules that define the elements of a

12  claim, affirmative defenses, presumptions, burdens of proof, and

13  rules that create or preclude liability are clearly substantive,

14  and their application is diversity actions is required. <u>Guaranty</u>

15  <u>Trust Co. of New York v. York</u>, 326 U.S. 99, 109-11 (1945)

16  (statute of limitations); <u>Dick v. New York Life Ins. Co.</u>, 359

17  U.S. 437, 446-47 (1959 (presumptions and burden of proof). A

18  federal court in a diversity case applies state law of contract

19  formation, interpretation, and admissibility of parol evidence.

20  <u>Pacific Portland Cement Co. v. Food Machinery and Chemical Corp.</u>,

21  178 F.2d 541, 546 (9th Cir. 1950); <u>Computer Economics, Inc. v.</u>

22  <u>Gartner Group, Inc.</u>, 50 F.Supp.2d 980, 990-91 (S.D.CA 1999).

23          2. <u>Contract Law</u>

24      Except as otherwise provided by law, 1) a party has the

25  burden of proof as to each fact the existence or nonexistence of

26  which is essential to the claim for relief or defense that he or

27

28                              17

1  she is asserting; and 2) the burden of proof, or the obligation

2  of a party to establish by evidence a requisite degree of belief

3  concerning a fact in the mind of the trier of fact, quires proof

4  by preponderance of the evidence. Cal. Evid. Code §§ 500, 115.

5       "A contract is an agreement to do or not to do a certain

6  thing." Cal. Civ. Code § 1549. "It is essential to the existence

7  of a contract that there should be: 1. Parties capable of

8  contracting; 2. Their consent; 3. A lawful object; and 4. A

9  sufficient cause or consideration." Cal. Civ. Code § 1550. The

10 elements of a claim for breach of contract are the existence of a

11 contract, Plaintiff's performance thereof or excuse for

12 nonperformance, Defendant's breach, and damages resulting

13 therefrom. Reichert v. General Ins. Co. of America, 68 Cal.2d

14 822, 830 (1968); Acoustics, Inc. v. Trepte Construction Co., 14

15 Cal.App.3d 887, 913 (1971).

16      It is Plaintiff's burden to establish a breach of contract.

17      Defendant argues that Plaintiff cannot establish the element

18 of Defendant's breach of any provision concerning premiums

19 because Defendant has complied with the contract by performing an

20 audit of premiums and returning what was due.

21      It is undisputed that the policy was audited on September

22 28, 2006; it is also undisputed that the audit revealed lower

23 than estimated exposures yielding a return premium of $119,219,

24 although Plaintiff contends that the audit yielded, or should

25 have yielded, a return of $133,267.

26      Plaintiff relies on ambiguity of the contract as a basis for

27

28                                 18

1 the existence of a genuine issue of material fact as to breach.

2     Whether a contract is ambiguous is a question of law for the

3 Court. <u>Airborne Freight Corp. v. McPherson</u>, 427 F.2d 1283, 1285

4 (9th Cir. 1970); <u>Winet v. Price</u>, 4 Cal.App.4th 1159, 1164-65

5 (1992). The clear and explicit meaning of words of a contract,

6 interpreted in their ordinary and popular sense, unless used by

7 the parties in a technical sense or a special meaning is given to

8 them by usage, controls judicial interpretation. Cal. Civ. Code

9 §§ 1638, 1644.

10     A contract is ambiguous if on its face or in light of

11 extrinsic evidence it is capable of two different reasonable

12 interpretations. Extrinsic evidence is admissible not to

13 contradict or very the terms of a contract, but rather to explain

14 its meaning, if the evidence is relevant to prove a meaning to

15 which the language of the contract is reasonable susceptible.

16 <u>Pacific Gas & Electric Co. v. G. W. Thomas Drayage & Rigging Co.,</u>

17 <u>Inc.</u>, 69 Cal.2d 33, 37 (1967); <u>Beneficial Fire & Cas. Ins. Co. v.</u>

18 <u>Kurt Kitke Co.</u>, 46 Cal.2d 517, 524 (1956).

19     Interpretation of a contract is a question of law unless it

20 turns on the credibility of conflicting extrinsic evidence.

21 <u>Parsons v. Bristol Development Co.</u>, 62 Cal.2d 861, 865-66 (1965)

22 The fundamental goal of contractual interpretation is to give

23 effect to the mutual intentions of the parties at the time of

24 contracting. Cal. Civ. Code § 1636; <u>La Jolla Beach & Tennis Club,</u>

25 <u>Inc. v. Industrial Indemnity Co.</u>, 9 Cal.4th 27, 37 (1994). In

26 determining the terms and meaning of an agreement, the Court will

27

28                         19

first, if possible, consider the entire document itself, Cal. Civ. Code § 1641; if it is clear and explicit, its terms govern, Cal. Civ. Code § 1638; La Jolla Beach & aTennis Club, Inc., 9 Cal.4th at 37. If necessary and appropriate, the Court will consider evidence outside the agreement. Cal. Civ. Proc. Code § 1856 provides in pertinent part:

> (a) Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement.

> (b) The terms set forth in a writing described in subdivision (a) may be explained or supplemented by evidence of consistent additional terms unless the writing is intended also as a complete and exclusive statement of the terms of the agreement.

> (c) The terms set forth in a writing described in subdivision (a) may be explained or supplemented by course of dealing or usage of trade or by course of performance.

> (d) The court shall determine whether the writing is intended by the parties as a final expression of their agreement with respect to such terms as are included therein and whether the writing is intended also as a complete and exclusive statement of the terms of the agreement.

> (e) Where a mistake or imperfection of the writing is put in issue by the pleadings, this section does not exclude evidence relevant to that issue.

> (f) Where the validity of the agreement is the fact in dispute, this section does not exclude evidence relevant to that issue.

> (g) This section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as defined in Section 1860, or to explain an extrinsic ambiguity or otherwise interpret the terms of the agreement, or to establish illegality or fraud.

Cal. Civ. Proc. Code § 1860 provides:

20

> For the proper construction of an instrument, the
> circumstances under which it was made, including
> the situation of the subject of the instrument,
> and the parties to it, may also be shown, so
> that the Judge be placed in the position of those
> to whose language he is to interpret.

A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates. Cal. Civ. Code § 1647. Ambiguity or uncertainty may be resolved by interpretation by the Court after the parties are given a full opportunity to produce evidence of the facts, circumstances, and conditions surrounding the contract's execution and the conduct of the parties relative thereto. Walsh v. Walsh, 18 Cal.2d 439, 443 (1941). The Court must interpret it in the sense in which the promisor believed, at the time of the contracting, that the promisee understood it. Cal. civ. Code § 1649. The parties' action or performance under the provisions of a contract may render the parties' intent sufficiently clear, such as where one party performs and the other accepts the performance without objection. Bohman v. Berg, 54 Cal. 2d 787, 794-95 (1960) The practical construction placed upon a contract by the parties before any controversy has arisen as to the meaning of the contract is considered a reliable method of ascertaining the intent of the parties. Id. A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties Cal. Civ. Code § 1643.

1    If uncertainty persists, a contract may be interpreted most
2 strongly against the party who caused the uncertainty to exist.
3 Cal. Civ. Code § 1654.

4         E. <u>Analysis</u>

5    The policy provides:

6       This policy contains all the agreements between the
        you and us concerning the insurance afforded. The
7       first Named Insured shown in the Declarations is
        authorized to make changes in the terms of this
8       policy with our consent. This policy's terms
        can be amended or waived only by endorsement
9       issued by us and made a part of this policy.

10   The Court concludes that the policy was intended by the
11 parties as a final expression of their agreement with respect to
12 the terms included therein and was also intended as a complete
13 and exclusive statement of the terms of the agreement. The Court
14 thus focuses on the face of the policy.

15   The minimum premium endorsement states on its face that it
16 sets forth the provisions for calculation of premiums due and
17 that premiums due "shall be" calculated in accordance with it.

18   The first paragraph clearly states that the minimum earned
19 premium "shall be fully earned at the inception of the policy"
20 and that it is twenty-five per cent of the amount entered as the
21 total policy premium in the Declarations. Although the second
22 sentence provides that the premium on the Declaration is a
23 provisional premium only and is subject to adjustment in
24 accordance with the audit provisions of the policy, to interpret
25 it as modifying the first paragraph and thus to mean that even
26 the minimum earned premium could be varied would not be

27
28                        22

reasonable. This is because the first numbered paragraph expressly states that the minimum earned premium shall be fully earned at the inception of the policy. The only reasonable interpretation of this language is that at the time the policy takes effect, the minimum "earned" premium is "fully earned," and thus that the amount is not subject to change, despite the fact that throughout or after the period of the contract, a determination would be made as to the earned premium for the contract overall. Therefore, twenty-five per cent of the premium actually stated on the declarations portion of the policy is an absolute minimum for an earned premium and is not subject to change.

The third paragraph addresses the "minimum policy term premium." The parties have not indicated that this term appears in other locations in the agreement. However, it is reasonably understood to refer to the minimum premium for the entire term of the policy, considering and/or despite any audit adjustments.

If any reasonable uncertainty existed as to the interaction of the first and second paragraphs of the minimum premium endorsement, then the third paragraph clarifies, for it expressly limits the amount of any return premium calculated in accordance with audit rules. It provides not only that the minimum policy term premium for the policy is eighty per cent of the premium shown in the declarations, but it further states that if according to the audit rules there is a return premium and it exceeds twenty per cent of the premium shown as the total policy

premium in the declarations, then it is only the lesser sum (i.e., twenty per cent of the total policy premium stated in the declarations) that will be returned.

It would not make sense to interpret the language of the third paragraph regarding "total policy premium in the Declarations" as signifying an adjusted premium, as distinct from the provisional amount entered in the declarations, because the amount stated in the declarations portion of the policy is identifiable and constant, and the reference thereto is reasonably understood as such and is distinguished from other, variable formulations of premiums.

Reference to other provisions of the contract reveal additional consistent language reflecting three types of premiums, namely, advance or deposit, audit, and earned. The policy provided that the advance premium was a deposit premium only; an <u>earned</u> premium would be computed at the close of each audit period, and if the sum of the advance and audit premiums <u>paid</u> exceeded the <u>earned</u> premium, then the excess would be returned to the insured.

The provision for return of the amount of policy premiums paid that exceed the earned premium refers to a situation where the sum of the advance and audit premiums paid exceeds the earned premium. Here, regardless of whether Plaintiff's or Defendant's calculation of the sum is considered, there is an excess. Provision 5 concerning "Premium Audit" states that "we will return the excess to the first Named Insured." (Manzi Decl., Ex.

24

B, p. QUANTA000032.) This provision purports to return the sum,
or the difference, to the insured.

However, it is established that if reasonably practicable,
the whole of a contract is to be taken together so as to give
effect to every part, each clause helping to interpret the other.
Cal. Civ. Code § 1641. Further, in the construction of an
instrument, the intention of the parties is to be pursued, if
possible, and when a general and particular provision are
inconsistent, the latter is paramount to the former, so that a
particular intent will control a general one that is inconsistent
with it. Cal. Civ. Proc. Code § 1859.

Here, the more specific "MINIMUM PREMIUM ENDORSEMENT"
provision relates to the same subject as the more general premium
audit provision, and it is partially inconsistent with it. It
acknowledges the provisional nature of the advance or deposit
premium entered on the declarations but nevertheless provides for
a minimum fully earned premium as of the inception of the policy,
and as of the expiration of the full term of the policy without
regard to the amount of the excess premium. Further, it states in
two different ways a minimum full term premium, and a
corresponding maximum return of excess premium, which limit the
amount to be returned to the insured.

A breach of contract consists of unjustified, unexcused
nonperformance of a material promise. Sterling v. Gregory, 149
Cal. 117, 121 (1906); Woodard v. Glenwood Lumber Co., 171 Cal.
513, 522 (915); see, 1 Witkin, Summary of California Law § 847

25

1  (10th ed. 2005). The failure to perform may arise from the wilful

2  breach of the promise or from a negligent performance of failure

3  to perform. Chapman v. California, 104 Cal. 690, 694 (1894).

4       The contract unambiguously provided for return of the lesser

5  amount, namely, twenty per cent of the total policy premium shown

6  in the declarations. In light of the foregoing analysis, it

7  appears that Defendant has introduced evidence demonstrating that

8  Plaintiff could not establish that Defendant breached the

9  contract by the return of 20 per cent of the premium shown in the

10  Declarations, even if the audit's return premium exceeded it.

11       Whether a contract is ambiguous is a question of law. United

12  States v. Sacramento Municipal Utility Dist., 652 F.2d 1341,

13  1343-44 (9th Cir. 1981). A disputed issue of material fact exists

14  as to breach if the contract provisions for return of premiums is

15  ambiguous and if Plaintiff's construction of the contract

16  provision for premium return is reasonable. The Court concludes

17  that taking the meaning of the words in the policy in their plain

18  and general sense, the agreement is not ambiguous, and the Court

19  thus determines the meaning of the contract as a matter of law.

20  See, Tzung v. State Farm Fire and Cas. Co., 873 F.2d 1338, 1340-

21  42 (9th Cir. 1989).[4]

22       Plaintiff argues that in view of the actual exposure, to

23  permit the insurer to retain such a large portion of premium

24

25       [4] Defendant's objection that Exhibit C is not a true and correct copy of policy 5381 is overruled; it is

26  presented by Plaintiff as excerpts only. (Decl. of Pltf. ¶ 7.) The Court notes the contradiction of Plaintiff's assertion
   that the insurance summary prepared by Rogers and Young and dated January 11, 2006, contained no reference to an

27  80 per cent premium, by the insurance summary itself, Ex. L.

28                                         26

1    payments constitutes unjust enrichment and could not have been
2    intended by the parties. However, it is generally through
3    objective manifestations that the intent of the parties is
4    determined. Further, it is established that under California law,
5    it is presumed from voluntary execution of an agreement that a
6    contract expresses the true intention of the parties, and the
7    burden of demonstrating that the contract did not conform to such
8    intention rests upon the party seeking to avoid the express terms
9    of the contract. Central Mfrs. Mut. Ins. Co. v. Jim Dandy
10   Markets, 77 F.Supp. 171, 174 (D.C.Cal. 1948), affd., Smith v. Jim
11   Dandy Markets, 172 F.2d 616 (9th Cir. 1949). Although the loss to
12   the insured is considerable, given the objective manifestations
13   of the parties' intentions in the terms of the policy, there is
14   no basis for a finding of unjust enrichment.

15        Accordingly, the Court concludes that Defendant has shown
16   that there is no disputed issue of material fact with respect to
17   the presence of a breach of the general liability contract,
18   policy number QNG0005381-00; Defendant is entitled to judgment as
19   a matter of law on the third claim for breach of contract and
20   fourth claim, a common count for money had and received by
21   defendant for the use and benefit of Plaintiff.

22        III. Greenly Oaks Policy, No. QNG0005153-00

23            A. Background

24        Plaintiff's first claim is for breach of contract, namely, a
25   general commercial liability insurance policy, policy no.
26   QNG0005153-00, with a term from July 18, 2005 through January 18,

27

28                                  27

2008, issued by Quanta for a construction project involving developer Greenly Oaks Village Development Corp., and later amended to include "Sonora Greenly Oaks LLC in lieu of Greenly Oaks Villages Development Corp.," and "Moore Construction," as named insureds. (Undisp. Facts nos. 1-5.) The contract was allegedly breached by Quanta's failure to refund premiums, resulting in an overcharge/refund due of $107,921. (Doc. 4, p. 14; Neilson Decl., Ex. A, Pltf.'s response to requests for admission, set one, nos. 7-9.)

The parties agree to the existence of the insurance policy between Plaintiff and Defendant, and it is undisputed that Plaintiff Moore financed the premium for the contract through AFCO Acceptance Corporation (AFCO), a third-party premium finance company, with whom Moore entered into a separate premium finance agreement. (Undisputed Facts 1-7.) Further, it is undisputed that Moore stopped making installment payments to AFCO for the Greenly Oaks Policy premium in October 2006, AFCO canceled the policy in December 2006, notice of cancellation was mailed on December 15, 2006, and the policy was cancelled as of December 21, 2006. (Undisputed Facts Nos. 10-12.) Moore never made premium payments to Quanta, but rather to AFCO. Moore admitted that it did not pay $219,796 as alleged in the complaint, but rather put $57,189 down and made installment payments through October 2006 totaling $89,736, for a total of $146,925, excluding late charges. (Neilson Decl., Ex. A, Pltf.'s response to requests for

1  admissions, set one.)[5]

2      The second claim is a common count for money had and

3  received by Defendant for money paid, laid out, and expended to

4  or for defendant at defendant's special instance and request, for

5  the use and benefit of Plaintiff, namely, an insurance premium

6  overpayment, in the sum of $107,921.00, plus prejudgment interest

7  and attorney's fees; it is alleged that the insurance policy

8  provides for an adjustment, and to the extent that the policy is

9  to be read differently, it is ambiguous, and any ambiguity should

10 be read in favor of Plaintiff; to allow Defendant to keep the

11 higher premiums paid would constitute unjust enrichment. (Doc. 4

12 p. 16.)

13     Plaintiff claims that Quanta wrongfully issued an adjustment

14 of the total policy premium and issued a check in the amount of

15 $79,060 (Memo. in Opp., p. 3 ll. 19-20), and Plaintiff states

16 that the check was not received by Plaintiff and may have

17 inadvertently have been given to Sonora Greenly Associates

18 Ventures LLC; Defendants assert that the refund was given to

19 AFCO.

20     The basis for Plaintiff's claim of entitlement to a refund

21 of premiums is the policy's "minimum premium endorsement," which

22 stated:

23

24     [5] Defendant objects to Plaintiff's representation that he paid $219,796 in premiums as inconsistent with his

25 response to requests for admissions. The Court notes that although Plaintiff in his declaration did assert that he
   "paid" premiums of $219,796 (Decl. ¶¶ 4, 22), the Court interprets this as an imprecision in light of his response to

26 requests for admission as well as clearer, more specific descriptions of the figure of $219,796 as the total premium
   charged (Decl. ¶ 9, and Ex. B), and thus the Court concludes that there is not any factual inconsistency that raises an

27 issue of fact.

28                                    29

The premium(s) due for this policy shall be calculated in accordance with the following:

1. The minimum earned premium shall be fully earned at the inception of the policy and is twenty five percent (25%) of the amount shown as the total policy premium on the Declarations.

2. The total policy premium shown on the Declarations is a provisional premium only and is subject to adjustment in accordance with the audit provisions of this policy.

3. The minimum policy term earned premium for this policy is one hundred percent (100%) of the premium shown as the total policy premium on the Declarations.

(Doc. 4, p. 14, Att. BC-1 to First Cause of Action, also consisting of Exhibit A to the complaint, page 3, paragraph 2; Decl. of Manzi, Ex. A, p. QUANTA000137.) Plaintiff argues that Plaintiff was entitled to a refund pursuant to this section, and such refund should have been computed on a pro rata basis, and specifically in terms of a ratio involving the estimated premium and the actual premium based on amounts of business.

Defendant argues that the premium finance agreement (PFA) governs the payment obligations of Moore and AFCO's rights concerning the policy. AFCO charged $219,796 to finance the policy (total premium of $207,790.52, plus a finance charge of $12,006.88. (Neilson Decl., Ex. A [Plaintiff Moore's response to Quanta's requests for admission (set one), responses nos. 7-9.])

The underlying insurance policy issued by the insurer provides:

[A. 5.] If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named insured cancels, the refund may be less than pro rata....

(Moore Decl., Ex. A, "PAGE 04" (indicated in top right corner).) Here, the cancellation was not effected by the insured, but rather was by the premium finance company. Because it was not by the insured, it appears that under the insurance policy the refund would be "pro rata."

Further, the PFA appears also to provide for a pro rata refund. The PFA provides that the policies can be cancelled by the insured or the company on ten days notice, and the unearned premiums will be computed on the standard short rate or pro rata table except as indicated. (Neilson Decl., Ex. D, p. 1.) The parties do not indicate that there was any contrary provision in the PFA, so it appears that the PFA also provides for a pro rata return.

The PFA provides for AFCO a security interest, assignment of the right to unearned premiums, and appointment as attorney-in-fact:

> 3. SECURITY INTEREST: The insured assigns to Afco as security for the total amount payable in this Agreement any and all unearned premiums and dividends which may become payable under the insurance policies and loss payments which reduce the unearned premiums, subject to any mortgagee or loss payee interests. The insured gives to Afco a security interest in all items mentioned in this paragraph.
>
> ....
>
> 9. CANCELLATION: Afco may cancel the insurance policies and the unpaid balance due to Afco shall be immediately payable by the insured if any of the following occur: (a) The insured does not pay any installment according to the terms of this Agreement, (b) The insured does not comply with any of the terms of this Agreement; (c) The insured or the Insurer voluntarily or involuntarily becomes the subject of a bankruptcy, receivership, or any other kind of insolvency proceeding; (d) if the

31

Insured is a business and stops doing business or ceases to be qualified to do business. Afco at its option may enforce payment of this debt without recourse to the security given to Afco.

10. POWER OF ATTORNEY-LIMIT OF LIABILITY: <u>The insured irrevocably appoints Afco its Attorney-In-Fact with full authority to cancel the insurance policies, receive all sums assigned to Afco or in which it has granted Afco a security interest, and Afco may execute and deliver on the Insured's behalf all documents, instruments of payment, forms and notices of any kind relating to the insurance policies in furtherance of this Agreement.</u> Afco's liability to any person or corporation on the exercise of its authority to cancel the insurance policies is limited to the amount of the principal balance, except if Afco wilfully fails to mail the noticed required by law.

11. MONEY RECEIVED AFTER NOTICE OF CANCELLATION: Any payments made to Afco after Afco's Notice of Cancellation of the insurance policies has been mailed may be credited to the Insured's account without affecting the acceleration of this Agreement and without any liability or obligation on Afco's part to request the reinstatement of the cancelled insurance policies. <u>Any money Afco receives from an insurance company shall be credited to the amount due Afco with any surplus being paid to whomever is entitled to the money. No refund of less than $1.00 shall be made. If there is a balance due after Afco receives the unearned premiums, dividends or loss payments from the insurance company then the insured will pay the balance to Afco with interest at the rate shown in this contract.</u> (Emphasis added).

(<u>Id.</u> p. 2.)

        B. <u>Payment to AFCO, the Finance Company</u>

Defendant poses the first issue as whether or not Quanta acted improperly by returning the unearned policy premium to a premium finance company, AFCO, instead of returning it to Plaintiff.

Defendant argues that Cal. Ins. Code § 673 required Quanta to remit any unearned policy premium to the entity that paid for

32

1  the policy, and thus Defendant has shown that it has a complete

2  defense to Plaintiff's first and second claims for relief.

3      As to the identity of the entity to whom a premium that is

4  unearned because of cancellation must go, Defendant is correct.

5  Cal. Ins. Code § 673 governs the exercise by a lender of the

6  insured's right to cancel an insurance policy pursuant to a

7  written transfer or assignment by the insured of the right to

8  cancel to the lender who has advanced the premium for the policy

9  to the insurer. Section 673(a), (b). The statute requires that

10 written notice of cancellation be mailed to the insurer and

11 insured specifying a date five days or more after the date of

12 mailing of the notice as the effective date of cancellation. §

13 673(c). Thereafter, written exercise of the cancellation right

14 containing a confirmation of the effective date of cancellation

15 shall be mailed by the lender to the insurer within five days

16 following the effective date of cancellation, and cancellation is

17 effective without return of the policy upon the confirmation. §

18 673(e). It further provides in pertinent part:

19     (g) Whenever such a financed insurance policy is canceled
   by any party for any reason:

20

21     (1) The insurer shall, in accordance with the
   written agreements of which it has notice, return to
   the lender such unearned premiums as are due to the

22 lender. The amount of the return premiums shall be
   based upon the confirmed date of cancellation as

23 specified in subdivision (e), or upon the written notice
   of cancellation specified in subdivision(d) in the

24 case of an industrial loan company, lessened by the
   amount, if any, to compensate equitably the insurer for

25 carrying the risk of loss as to any governmental agency,
   mortgagee, or other parties specified in subdivision (f)

26 from that date to the effective date of cancellation
   as to those parties.

27

28     33

(2) When a financed insurance policy is cancelled,
or the insured discontinues payments to a lender, the
insurer shall calculate the return premium on a pro rata
basis. This paragraph shall not apply to any policy issued
under an assigned risk plan or to any policy with respect
to which the insurer has made a loan to the insured for the
purposes of payment of premiums for the policy.

....

(i) A lender which sends a written exercise of
cancellation right or a written notice of cancellation
to an insurer, as provided in subdivision (c) or
subdivision (d) in the case of an industrial loan company,
thereby represents that he or she has a valid right to
do so and to receive the unearned premium. If the lender
thereby accomplishes the cancellation and receives an
unearned premium, such representation shall be conclusive
as between the insurer and the lender. An insurer relying
on the written exercise of that right containing a
confirmation of cancellation date and giving, when
applicable, notice as required by subdivision (e), shall
be relieved from complying with any other duty or form
of cancellation required by this code. (Emphasis added.)

Cal. Ins. Code § 673.

It is undisputed that the policy was cancelled by AFCO with
an effective date of December 21, 2006. (Undisputed Fact Nos. 11-
12.)

Cal. Ins. Code § 480 provides generally that an insurer is
entitled to payment of the premium as soon as the subject matter
insured is exposed to the peril insured against. Cal. Ins. Code §
481 provides that unless the insurance contract otherwise
provides, a person insured is entitled to a return of premium if
the policy is canceled, rejected, surrendered or rescinded, "as
follows":

1) To the whole premium, if the insurer has not been
exposed to any risk of loss.
2) Where the insurance is made for a definite period
of time and the insured surrenders his policy, to such
proportion of the premium as corresponds with the

34

<u>unexpired time</u>, after deducting from the whole premium
any claim for loss or damage under the policy which
has previously accrued. The provisions of Section
482 apply only to the expired time. (Emphasis added.)

Cal. Ins. Code § 481(a). Section 481(b) prohibits a policy

provision that the premium for such policy shall be fully earned

upon the happening of any contingency except the expiration of

the policy itself, but only with respect to "individual vehicle

liability or homeowners multiple-peril insurance." Section 482

states that except as provided by the contract or section 481, if

a peril insured against has existed, and the insurer has been

liable for any period, however short, the insured is not entitled

to a return of premiums, so far as that particular risk is

concerned. Section 481.5 provides a time limit of eighty business

days for the tender of gross unearned premium (unearned portion

of the full amount of premium charged to the insured, including

unearned portion of any amount of the premium the insurer

allocated to an agent or broker as commission) if the policy is

not auditable; if it is auditable, the gross unearned premium

shall be tendered within eighty business days after the insured

provides all requested audit information to the insurer or

insurer's designee. If the amount cannot be determined due to the

insured's failure in breach of the policy to cooperate in a

premium audit or the amount of unearned premium determined by an

audit remains in dispute, then the insurer is not required to

make the tender within the time. The section provides for

interest on amounts not returned.

Here, the provisions of the contract and of the statute with

35

respect to premiums unearned because of cancellation appear to be consistent because both refer to the return of unearned premiums on a pro rata basis. The PFA unambiguously grants to AFCO as lender the authority to cancel the contract and to recover the unearned premiums as assignee and holder of a security interest. Cal. Ins. Code § 673 requires the insurer to return to the lender the unearned premiums as are due to the lender based on the confirmed date of cancellation. It also provides that if appropriate written exercise or notice of the right of cancellation is given by the lender to the insurer, and the lender receives an unearned premium, the representation is conclusive between the insurer and lender.

It therefore appears that Defendant has demonstrated that making the payment to AFCO instead of to the first named insured was consistent with the contract and the governing statute. Plaintiff cannot demonstrate that an issue of material fact exists with respect to breach of contract by the insurer in the form of making the payment to AFCO.

C. Amount of Return Premium

With respect to premiums unearned because of cancellation of the policy before the running of the contract's term, because the policy was for a definite period or term, Cal. Ins. Code § 481(a)(2) requires computation of unearned premiums upon cancellation to be for "such proportion of the premium as corresponds with the unexpired time...."

As to the calculation of the unearned premium, HBW Insurance

36

Services (HBWIS), an entity which administered the policy, notified Quanta of the cancellation through a data feed verified by a cancellation endorsement to the policy; HBWIS on behalf of Defendant Quanta factored the unearned premium using a pro rata calculation based on the total number of days in the policy period and the number of days left in the policy period from the date of cancellation. (Decl. Manzi, ¶¶ 3-4.)

Specifically, Manzi's declaration states that the deposit premium was $183,861; the final booked premium was $104,801; the difference was $79,060. (Id.) A cancellation endorsement reflects cancellation for nonpayment of premium due effective December 21, 2006, with return premium of $79,060. (Id., Ex. A p. QUANTA000069.)

Plaintiff does not submit any evidence raising a dispute regarding the insurer's calculation of the amount of the pro rata distribution based on the unexpired time period of the policy. Plaintiff admits that the common policy declaration for the Greenly Oaks policy identified a total policy premium of $183,861. (Neilson Decl., Ex. A, Pltf.'s Resp. to RFA's (set one), RFA no. 2.) Plaintiff also admitted that AFCO charged a total premium of $207,790.52 plus a finance charge of $12,006.88 to finance the policy. (Id., RFA no. 7.) Plaintiff further admitted that Plaintiff did not actually pay $219,796 for the policy as alleged in the complaint (id., RFA no. 8), but rather paid $57,189 down and made installment payments through October 2006 totaling $89,736, for a total of $146,925 excluding late

37

charges, (id. RFA no. 9). Plaintiff responded to a request for production by producing a letter in which he identified an attached accounting on paper headed with AFCO's identifying information as an invoice collection record for the Greenly policy; the letter noted, and the invoice record reflected, that $76,274.65 was the amount of a returned "return premium" returned to someone other than Plaintiff, and Plaintiff received $3,707.14. (Neilson Decl., ¶ 5, Ex. E.) Plaintiff admits as undisputed the fact that AFCO, the entity with whom Plaintiff contracted to finance the premium on the policy, returned a surplus of $3,707.14 to Moore on or about June 15, 2007. (Undisputed Fact No. 15.)[6]

This appears to be a computation on a pro rata basis in keeping with Cal. Ins. Code § 481 because the insurance was for a definite period of time, and the premium was refunded in a proportion corresponding with the unexpired time. Further, it was correctly directed to the finance company pursuant to the premium

---

[6] Plaintiff's calculations concerning a distribution asserted by Plaintiff to be pro rata (Decl., Exhibit B) are based on a ratio of actual revenues to revenues estimated at the time the policy was written, and are of limited admissibility for the same reasons noted in connection with the discussion of the general liability contract.

Similarly, Plaintiff's present opinions concerning ambiguity, breach, and the meaning of the contract are inadmissible.

Moore admitted that he received on or about June 14, 2007, a letter from AFCO dated June 14, 2007, which was a reply to Moore's earlier letter (Decl., ¶ 33, Ex. F, item e, admittedly mailed by Moore on May 29, 2007), and which explained that AFCO did not calculate unearned premiums, but insurer Quanta had done so; consistent with an attached invoice collection record, AFCO received return premiums of $68,112.17 on March 9, 2007, and an additional payment of $7,568.02 on June 5, 2007, which had all been applied to Moore's account, resulting in a surplus of $3,707.14, which would be refunded to Moore's agent within three business days. (Decl., ¶ 33, Ex. F, item k.) This evidence qualifies Moore's statement that Moore was not aware of any refund to AFCO by Quanta.

The Court overrules Defendant's objection to Exhibit A to Moore's declaration because Moore characterized the excerpts from the policy as excerpts. (Decl., ¶ 2.)

The Court overrules Defendant's objection on grounds of lack of authentication and foundation to Exhibit F to Moore's declaration. The Court sustains Defendant's objections on the grounds of lack of authentication and foundation to Exhibit H.

38

finance agreement (PFA).

Thus, the Court concludes that Plaintiff is not asserting that Defendant incorrectly calculated the pro rata return of premium; rather, Plaintiff is arguing either or both of the following: 1) that AFCO returned the money to the wrong entity, and/or 2) that the measure of the premium to be returned was incorrect because it should have included unearned premium as determined by an audit by the insurer.

To the extent that Plaintiff is complaining of AFCO's conduct, the complaint is not before the Court because AFCO is not a party to this action.

With respect to Plaintiff's disagreement with the measure of the return premium, from the admissions and evidence produced by Plaintiff, it is concluded that Plaintiff is seeking additional unearned policy premiums consisting of amounts that Plaintiff asserts were due from an audit of the policy which did not occur.

Preliminarily, the Court notes that although Plaintiff assigned its right to unearned premiums to AFCO as part of the premium finance agreement (PFA), the admitted balance sheet from AFCO reflects that the amount due to AFCO from Plaintiff under the premium finance agreement has been paid. (Neilson Decl., ¶ 5, Ex. E.) Although an assignor generally may not maintain an action upon a claim after it has made an absolute assignment thereof to another, an assignor for security retains an interest sufficient to bring an action for any surplus after the debt secured is satisfied. Bridge v. Connecticut Mut. Life Ins. Co., 167 Cal.

39

774, 777-78 (1914); <u>First Nat. Bank of Stockton v. Pomona Tile Mfg. Co.</u>, 82 Cal.App.2d 592, (1947). The Court therefore considers whether there is a material issue of disputed fact concerning breach in the form of the insurer's failure to audit the policy and pay to Plaintiff unearned premiums based on an audit.

The Court will construe the policy in its entirety, with each clause lending meaning to the others. <u>Holz Rubber Co, Inc. v. American Star Ins. Co.</u>, 14 Cal.3d 45, 56 (1975). The contract does not contain a promise on the part of the insurer to audit a policy that is cancelled. The premium audit provision in the contract states that the earned premium for each audit period will be computed at the close of each audit period, and that the due date for audit and retrospective premiums is the date shown "as the due date on the bill." (Manzi Decl., Ex. A, p. QUANTA000099.) Plaintiff points to no evidence concerning any audit period, or any bill or due date that corresponds with this provision or otherwise specifies if or when an audit must be performed on a cancelled policy. No audit rules or other documentary materials from the insurer that would amplify the terms of the contract have been submitted.

The provision that states that the composite rate premium for the policy shall be based on stated exposures does not constitute a basis for implying any obligation on the part of the insurer to audit a cancelled policy; rather, it is reasonably understood simply as a description of the exposures and rate used

40

1  to establish the initial composite rate premium amount.

2      The minimum premium endorsement addresses the calculation of
3  premiums due for the policy, and it specifies that the total
4  policy premium shown on the Declarations is a provisional premium
5  only and is subject to adjustment in accordance with the audit
6  provisions of the policy. However, the total policy premium is
7  subject to adjustment "in accordance with the audit provisions of
8  this policy," and there is no provision in the contract about
9  auditing cancelled policies. The reference in the third numbered
10  paragraph of the minimum premium endorsement to a "minimum policy
11  term earned premium" does not expressly or impliedly refer to a
12  cancelled policy; indeed, it appears to refer to something
13  involving the policy term, or entire life of the term policy, and
14  to something that is earned; it is not reasonably understood as
15  applying to a cancelled policy.

16      Instead, the contract contains a specific provision
17  concerning return premiums for a cancelled policy, and it
18  specifies a pro rata computation based on the pertinent unexpired
19  time of the contract's term. This specific provision is properly
20  read as controlling over the provisions concerning premium audits
21  in general; it is established that in the interpretation of
22  insurance contract, a specific provision relating to a particular
23  subject will govern in respect to that subject, as against a
24  general provision, even though the latter, standing alone, would
25  be broad enough to include the subject to which the more specific
26  provision relates. Kavruck v. Blue Cross of California, 108

27

28         41

1  Cal.App.4th 773, 781 (2003).

2      Application of this general principle leads to a conclusion
3  that the insurer's general obligation to audit policies at the
4  end of audit periods or at the end of the policy's term is
5  qualified by the more specific obligation to return unearned
6  premiums on a pro rata basis, calculated on a basis of the ratio
7  of the expired to the unexpired term, on policies that are
8  cancelled. The plain meaning of the contract's terms supports
9  this conclusion.

10     Further, although the provision concerning cancellation and
11 return of pro rata premiums could have been drafted to exclude
12 other audit processes more explicitly, it was not necessarily
13 ambiguous because of the failure to do so. See, Great Western
14 Drywall, Inc. v. Interstae Fire & Casualty Co., 161 Cal.App.4th
15 1033, 1042 (2008).

16     Accordingly, because the policy does not impose a duty on
17 the insurer to return premiums in the circumstances of this case,
18 Plaintiff cannot establish that the insurer breached the contract
19 by not auditing the cancelled policy and returning a portion of
20 the premium on that basis.

21     The Court does not agree with Plaintiff that a failure to
22 audit a cancelled policy is necessarily unfair, productive of a
23 windfall to the insurer, or not within the reasonable
24 expectations of the parties. The exposures might vary throughout
25 the course of a development or a project; the insurer might have
26 bargained to devote resources to audits only in the specified

27

28                                   42

circumstances of reaching the end of a contract's term or a
determined audit period. The policy clearly specified the formula
for return of premiums for a cancellation, and it did not include
an audit or premium adjustment.

IV. <u>Undue Influence</u>

Plaintiff argues that the minimum premium clauses in the
policies can be "nullified" based on the doctrine of undue
influence which resulted in a lack of free consent to the
contract and Defendant's taking undue advantage of Plaintiff's
necessity.

Plaintiff sues for breach of contract and common counts; it
does not appear that undue influence was pleaded. It therefore
does not appear to be material.

However, if it is assumed that issues concerning undue
influence are within the scope of the pleadings, then the Court
notes that under California law, undue influence is defined by
Cal. Civ. Code § 1575 as:

> 1. In the use, by one in whom a confidence is
> reposed by another, or who holds a real or apparent
> authority over him, of such confidence or authority
> for the purpose of obtaining an unfair advantage
> over him;
> 2. In taking an unfair advantage of another's
> weakness of mind; or
> 3. In taking a grossly oppressive and unfair
> advantage of another's necessities or distress.

Cal. Civ. Code § 1575.

A confidential relationship can occur where the
vulnerability of one party to the other results in the
empowerment of the stronger party by the weaker which empowerment

43

has been solicited or accepted by the stronger party and prevents the weaker party from effectively protecting itself. Parrish v. National Football League Players Ass'n., 534 F.Supp.2d 1081, 1097 (N.D.Cal. 2007). A fiduciary relationship is a recognized legal relationship, such as a guardian and ward, trustee and beneficiary, agent and principal, or attorney and client, whereas a "confidential relationship" may be founded on a moral, social, domestic, or merely personal relationship as well as on a legal relationship. Richelle L. v. Roman Catholic Archbishop, 106 Cal.App.4th 257, 270-71 (2003). In either case, the essence is that the parties do not deal on equal terms because the person in whom trust and confidence is reposed and who accepts that trust and confidence is in a superior position to exert unique influence over the dependent party. Id.

The existence and scope of an agency is a generally question of fact, Brokaw v. Black-Foxe Military Institute, 37 Cal.2d 274, 278 (1951), unless the essential facts are undisputed and subject to only one inference, in which case it is a question of law, Van't Rood v. County of Santa Clara 113 Cal.App.4th 549, 562 (2003).

Here, the undisputed facts warrant an inference that an insurance broker acted on behalf of Plaintiff. An insurance broker is a person who, for compensation and on behalf of another person, transacts insurance other than life insurance with, but not on behalf of, an insurer. Cal. Ins. Code § 33. Insurance brokers who lack authority to bind the insurance company are not

44

agents of the insurance company, but rather are independent
contractors acting only on behalf of the insured and not the
insurer. Rios v. Scottsdale Ins. Co., 119 Cal.App.4th 1020, 1026
(2004); Marsh & McLennan of Calif., Inc. v. City of Los Angeles,
62 Cal.App.3d 108, 118 (1976). There is no evidence that
Plaintiff's broker had any authority to bind the insurance
company. Thus, there does not appear to have been any
relationship of authority or agency between Plaintiff and the
insurer; rather, Plaintiff was simply ultimately a party to a
contract with the Defendant. Mere contractual relationships,
without more, do not give rise to fiduciary relationships.
Oakland Raiders v. National Football League, 131 Cal.App.4th 621,
633-34 (2005). There is no evidence of any particular power or
influence that the insurer had with respect to Plaintiff. To the
contrary, it appears that Plaintiff was appropriately represented
by a broker who guided Plaintiff in his search for insurance
coverage.

Plaintiff submits no evidence warranting an inference of any
lack of power or capacity on the part of Plaintiff; Plaintiff
alleges no facts concerning any undue influence or persuasion
imposed on Plaintiff by Defendant. Plaintiff does declare that
the income or receipts from the project that was the subject of
the policy were less than expected; further, Plaintiff asserts
that an adjustment of premiums must occur with respect to the
cancelled policy. (Decl. ¶¶ 4-6, 9.) This does not constitute
evidence of any weakness on the part of Plaintiff at the time the

1  contract was entered into, any inequality in bargaining power, or
2  any undue or overbearing conduct on the part of the insurer.

3       Plaintiff may be relying on the fact that the insurer is a
4  corporation which assumedly writes many policies, and Plaintiff
5  is a smaller partnership and consumer. However, mere difference
6  in economic power and size and access to information is not
7  sufficient to show vulnerability to establish a fiduciary
8  relationship, Parrish v. National Football League Players Ass'n.,
9  534 F.Supp.2d 1081, 1097-98 (N.D.Cal. 2007), and it does not
10 establish here any confidential relationship accompanied by
11 inequality of position or method. Undue influence involves
12 subjecting a person of subnormal capacities to ordinary force, or
13 a person of normal capacity to extraordinary force such that the
14 will is overcome against judgment; excessive persuasion or
15 influence is generally accompanied by some of the following:
16 discussion of the transaction at an unusual or inappropriate
17 time, consummation in an unusual place, insistence demand that
18 business be finished at once, extreme emphasis on untoward
19 consequences of delay, use of multiple persuaders by the dominant
20 side against a single servient party, absence of third-party
21 advisers to the servient party, statements that there is no time
22 to consult financial advisers or attorneys. Myerchin v. Family
23 Benefits, Inc., 162 Cal.App.4th 1526, 1540 (2008) (choice not to
24 seek advice from third parties does not suggest one was a victim
25 of over-persuasion). Here, the evidence shows that Plaintiff was
26 represented by an insurance broker at the pertinent time, and
27
28                                46

1 there is no evidence warranting a reasonable trier of fact's

2 drawing of any inference of undue influence on the part of the

3 insurer during negotiations.

4     Plaintiff points to the fact that from Plaintiff's point of

5 view, the insurer gained a windfall from not auditing the

6 cancelled policy. However, Plaintiff provides no facts showing

7 oppression or surprise due to unequal bargaining power, or any

8 overly harsh or one-sided results that would tend to demonstrate

9 oppression. See, Myerchin v. Family Benefit, Inc., 162

10 Cal.App.4th 1526, 1541 (2008). To the extent that Plaintiff

11 claims an ambiguity existed, the Court notes the absence of any

12 affirmative promise on the part of the insurer to audit and

13 return premiums on a cancelled policy beyond the pro rata

14 distribution provided for in the specific cancellation provision.

15 Plaintiff's assertion of any onerous terms of the bargain comes

16 after the point at which Plaintiff decided to accept the bargain

17 and obtained coverage. Plaintiff's choice to obtain this policy

18 is not a basis for an inference of undue influence. Compare, Olam

19 v. Congress Morg. Co., 68 F.Supp.2d 1110, 1150-51 (N.D.Cal.

20 1999). Further, Plaintiff had the duty to read the policy.

21 Telford v. New York Life Ins. Co., 9 Cal.2d 103, 107 (1937).

22     In summary, the Court concludes that Defendant has shown

23 that there is no disputed issue of material fact with respect to

24 the presence of a breach of the Greenly Oaks contract, policy

25 number QNG0005153-00; Defendant is entitled to judgment as a

26 matter of law on the first claim for breach of contract and

27

28                       47

1  second claim, a common count.

2       V. <u>Disposition</u>

3       Accordingly, the Court concludes that Defendant has

4  demonstrated that there is no issue of material fact with respect

5  to any of Plaintiff's claims, and that Defendant is entitled to

6  judgment against Plaintiff on all claims in this action.

7       Therefore, it IS ORDERED that Defendant's motion for summary

8  judgment IS GRANTED, and the Clerk IS DIRECTED to enter judgment

9  for Defendant Quanta Specialty Lines Insurance Company and

10 against Plaintiff Moore Construction Co.

11

12 IT IS SO ORDERED.

13 **Dated:   June 22, 2009**                **/s/ Sandra M. Snyder**
                                       UNITED STATES MAGISTRATE JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                    48